**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | | |
|---|---|---|
| BREY CORP., t/a Hobby Works, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 8:11-cv-00718-AW |
| | ) | |
| LQ MANAGEMENT, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT LQ MANAGEMENT L.L.C.'S MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY AND**
**OPINIONS OF ROBERT R. BIGGERSTAFF**

The expert testimony and declarations of Robert R. Biggerstaff, a self-proclaimed computer forensics expert relied on by Plaintiff Brey Corporation ("Brey"), should be excluded under Federal Rules of Civil Procedure 702, 704 and 403. Biggerstaff's opinions are tainted by bias, riddled with improper legal opinion, and are so unreliable as to be inadmissible in support of Plaintiff's pending Motion for Class Certification. In fact, Biggerstaff is a self-professed privacy advocate who poses as a legal expert, despite the lack of any formal legal education. His half-baked opinions regarding the ascertainability of the proposed class in this case were revealed at deposition to be based on incorrect assumptions and faulty analysis. Though he admitted as much, he continues to insist that his inherently-flawed opinions do not matter because publication notice will suffice, despite the lack of a reliable list of class members of any kind. It is evident from this and similar testimony that Biggerstaff would say anything in support of certifying a TCPA class because his stated goal, like Brey's, is to punish defendants for

utilizing fax advertising.[1]  Biggerstaff oversteps the bounds permitted for expert witnesses so

egregiously that this Court should exclude any consideration of his testimony and opinions in

this case.

## BACKGROUND

Defendant incorporates by reference the Factual Background contained in its Opposition

to Plaintiff's Motion for Class Certification, filed concurrently.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Civil Procedure requires that expert testimony must

satisfy four requirements in order to be admissible.  First, the expert must be qualified "by

knowledge, skill, experience, training, or education."  Fed. R. Civ. P. 702.  Even if the expert is

qualified, the testimony, whether "in the form of an opinion or otherwise", will only be admitted

if:  "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of

reliable principles and methods, and (3) the witness has applied the principles and methods

reliably to the facts of the case."  *Id.*  Even if the testimony is relevant and reliable, it must still

"fit" the facts of the case and assist the trier of fact.  *Daubert v. Merrill Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579, 591 (1993).  "'Fit' is not always obvious, and scientific validity for one

purpose is not necessarily scientific validity for other, unrelated purposes."  *Id.*

In *Daubert*, the Court identified the factors to be used to determine if a theory constitutes

scientific knowledge that will assist the trier of fact:  whether the reasoning or methodology

underlying the testimony is scientifically valid and properly applied to the facts at issue; whether

---

[1] *See* Deposition of Brey Corp., t/a Hobby Works, by its corporate designee Michael C. Brey (May 30, 2012), at 52-54, 63-66 (describing collection of faxes and relationship with his long-time counsel Stephen Ring, stating, "My understanding was that he went after, sued people who sent junk faxes.  And that my giving him my junk faxes would enable that effort and presumably stop the people who were behind the massive amounts of junk faxes that we got at the time.") (attached as Ex. A).

it has been tested; whether it has been subjected to peer review or publication; and whether it has widespread acceptance in the scientific community. *Id.* at 593-94. In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999), the Supreme Court extended this interpretation of Rule 702 to non-scientific expert testimony.

     *Daubert* and its progeny require the trial judge to act as a gatekeeper to ensure that scientific testimony is not only relevant but reliable. *Daubert*, 509 U.S. at 597. The goal is "to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The party seeking to have the testimony admitted bears the burden of establishing these requirements. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). While the trial court is given broad discretion to admit or exclude expert testimony, "it is not discretion to perform the function inadequately. Rather, it is discretion to choose among *reasonable* means of excluding expertise that is *fausse* and science that is junky." *Kumho Tire*, 526 U.S. at 159 (Scalia, J., concurring) (emphasis in original).

     In the class certification context, the Court must make a determination that each requirement of Fed. R. Civ. P. 23 has been met based on the evidence presented. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), *clarified on den. of reh'g.*, 483 F.3d 70 (2d Cir. 2007); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316-17 (3d Cir. 2008). That evidence must be admissible, which, in the case of expert opinion testimony, means that it must comply with Rule 702 and be "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Dicta in the Supreme Court's *Wal-Mart v. Dukes* opinion indicates that a district court must conclusively rule on any *Daubert* challenge to an expert's qualifications or opinions *prior* to

3

rendering a decision on class certification.  *Dukes*, 131 S.Ct. at 2553-54 ("The District Court concluded that Daubert did not apply to expert testimony at the certification stage of class-action proceedings….We doubt that is so….") (internal citation omitted).  As the 7th Circuit held in *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16  (7th Cir. 2010), "[W]hen an expert's report or testimony is critical to class certification…the district court must perform a full *Daubert* analysis before certifying the class…."  *See also Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982-83 (9th Cir. 2011) (District courts must also "resolve any factual disputes necessary to determine" whether the evidence proffered is sufficient to satisfy Rule 23's prerequisites). Indeed, the District of Columbia Circuit recently vacated an order granting class certification based on an expert's proffered damage model where the district court did not closely consider the flaws in that model.  *In Re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013).

Any remaining doubt as to the place *Daubert* has at the class certification stage is dispelled by the Supreme Court's opinion in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). *Comcast* teaches that whether the prerequisites of Rule 23 are satisfied requires a vigorous and meaningful analysis that can and does overlap with the merits.  *Comcast*, 133 S. Ct. at 1432. Where an expert has been proffered on a critical issue at the class certification stage, only a full-scale Daubert inquiry can satisfy the requirement for a "vigorous analysis" as contemplated by the *Comcast* court.

Here, Biggerstaff's opinions are integral to the class certification decision because, without them (and even with them), Brey cannot demonstrate that the class is ascertainable. There are no fax logs in existence to identify the phone numbers (much less individuals or entities) to which the alleged noncompliant faxes were sent more than six years ago, in 2007.

Protus, the fax broadcaster that is alleged to have sent most of the faxes in question, does not have the logs. *See* Confidential Deposition of Eric Ducharme (Jan. 25, 2013), at 220-223, 275-76 (hereinafter, "Ducharme Dep.) (cited portions filed under seal as Ex. C-2 to LQ's Opposition to Plaintiff's Motion for Class Certification).  In an effort to address this gaping hole in their case, Brey turned to Infogroup, also known as Salesgenie, the company that was used by some LQ employees to identify potential fax recipients, or sales "leads".  In 2007, these LQ employees were able to generate reports based on specified criteria, from which they could then select all, some or none of the individuals or (more often) entities, download a list and then transmit that list to Protus, who would send the faxes.  Brey's counsel asked Infogroup, using its 2012 database,  to try to "recreate" the lists that three LQ employees would have generated in 2007 based on a limited amount of available saved search criteria.  Using the resulting new lists (the "2012 Lists"), Biggerstaff opines that the 2012 Lists represent, to a high degree of confidence, the list of leads sold to LQ in 2007, as well as the population of 2007 LQ fax recipients.   As in *Honda v. Allen*, Biggerstaff's opinions should be excluded because they are unreliable and "there is no indication [they] have been generally accepted by anyone other than" Biggerstaff.  *See Honda v. Allen*, 600 F.3d at 818.

## ARGUMENT

Biggerstaff's opinions regarding the adequacy of the Salesgenie 2012 Lists to identify the class should be excluded.  Biggerstaff is a privacy advocate who has a long history as a litigant in cases involving unsolicited advertising, and as a commentator in support of using the TCPA to punish senders of unsolicited faxes and other communications.  As such, his opinions are tainted with bias.  His opinions should also be excluded because they are unreliable and his methodology is riddled with errors and false assumptions, as well as improper legal opinions.  Under Rules 702, 704 and 403, Biggerstaff's opinions should be excluded in their entirety.

## I.    BIGGERSTAFF IS A BIASED AND UNRELIABLE ADVOCATE

Biggerstaff's opinions should be excluded as biased and unreliable because he is a self-proclaimed crusader against unsolicited advertising whose opinions are informed and infused by his advocacy.  As such, he is hardly a neutral and reliable source of computer forensics expertise, as would be required for this Court to accept his opinions in support of class certification.

Biggerstaff received a degree in chemical engineering from Clemson University in 1987. Deposition of Robert Biggerstaff (May 20, 2013), at 15 (attached as Ex. D to LQ's Opposition to Plaintiff's Motion for Class Certification) (hereinafter "Biggerstaff Dep.").  However, early in his career, he became involved in computer operations and support, and held positions with several companies between 1986 and 2003 in which he "was the interface between the electronic data systems and the engineers."  Biggerstaff Dep. at 37.  In 2003, he retired from Westvaco Corporation, where he was a Support Systems Engineer, and since then has engaged in expert and consulting work in the field of computer forensics.  *Id.* at 30, 45.[2]  He has been retained and offered testimony in numerous class action cases, almost all of which were brought by plaintiffs alleging TCPA violations.  *Id.* ("vast majority" are TCPA cases for plaintiffs).  Of these, more than half relate to a single database ("B2B database") that was exploited by an Illinois Plaintiffs' lawyer who has brought 50 or more TCPA cases, in most or all of which he has used  Biggerstaff as his computer expert to identify fax recipients.  *Id.* at 50.[3]  Since a TCPA violation carries a

---

[2] Biggerstaff may have come to the title of "computer forensics expert" relatively recently. In a deposition in 2010 in another TCPA case, Biggerstaff testified, "In this case, I didn't do anything forensic in terms of forensic analysis," and when asked if he had received any certifications in forensic engineering, he answered, "I don't know what that term means." Deposition of Robert Biggerstaff (Sept. 3, 2010), at 6-7, in *CE Design, Ltd. V. Cy Sadegi*, Case No. 07 C 5456 (N.D. Ill.) (attached as Ex. B).

[3] The B2B cases were all brought by Brian Wanca and other Illinois attorneys, who in a TCPA case obtained an electronic database from B2B that contained contact information for intended targets of fax advertisements.  Class counsel had allegedly obtained the B2B database on the basis of a promise of confidentiality. Although the district court certified a TCPA class,

statutory penalty of $500 per fax (and up to $1500 if the violation was willful and knowing), computing the number of faxes is essential to determining the "damages" caused by the unsolicited faxing in question.   Biggerstaff charges a flat fee of $18,000 per case, plus $400 per hour for depositions and trial, and expenses.  Biggerstaff Dep. at 11.[4]

However, long before he began serving as an expert witness in TCPA cases,  Biggerstaff made a name for himself as a crusader against unsolicited telephone calls and faxes. Biggerstaff's career as a TCPA advocate predates by at least five years his 2003 "retirement" from Westvaco Corp.  For example, on March 25, 1998, he wrote to the Federal Trade Commission, referencing his participation as a panelist on the FCC's "Privacy workshop last June," and stating that he has "a heightened sense of privacy issues" as a result of his "'inside knowledge' of the Internet, computer databases, their uses – and misuses."  Letter from R. Biggerstaff to Secretary, Federal Trade Commission (March 25, 1998) (attached as Ex. D).  He was by that time already "President of the National Association Mandating Equitable Databases (the NAMED, Inc.)," which he described as "a nonprofit consumer organization chartered to help educate the public about unsafe data industry practices and to assist consumers in 'opting out' and otherwise asserting their rights over the use of personal and private information."  *Id.*[5]

---

the Seventh Circuit vacated and reversed, stating that "class counsel have demonstrated a lack of integrity that casts serious doubt on their trustworthiness as representatives of the class." *Creative Montessori Learning Centers v. Ashford Gear, LLC*, 662 F.3d 913, 917 (7th Cir. 2011). Notwithstanding this decision, both Wanca and his expert  Biggerstaff have clearly profited immensely from the B2B database and the dozens of lawsuits it spawned.

[4]  Biggerstaff testified that the majority of the cases on his testimony list are B2B cases, and based on the case numbers, most were filed in 2009 or later.  There are more than 160 cases on his list (attached as Ex. C), and if even half are B2B cases, that would be 80 cases at $18,000 each (at minimum), for a total of $1,440,000 from the Wanca firm.

[5]  The reference to helping consumers "opt out" is contradicted by  Biggerstaff's comment to the Chicago Tribune in an August, 2000 article where he said, "Never call the number at the bottom asking to be taken off the list.… All that does is tell them that you're someone who looks at his junk faxes."  *See* Ex. E, attached.

Biggerstaff was not just an advocate and commentator on TCPA issues, he was a litigant as well.  An August 13, 1999, press release issued by his organization, NAMED, touted his victory over AT&T in a lawsuit involving telemarketing calls to him that he alleged continued after he asked AT&T to stop.  *See* Ex. F, attached.  The press release stated, "Biggerstaff plans to continue his crusade against illegal telemarketing, and has several other suits pending."  *Id.*  In at least one of those suits, a putative class action brought against Voice Power Telecommunications, Inc. under the TCPA for making unsolicited automated advertising calls, Biggerstaff served as the named plaintiff on behalf of other, similarly situated South Carolina residents.  *See Biggerstaff v. Voice Power Telecommunications, Inc*., 221 F.Supp.2d 652 (D.S.C. 2002) (remanding case to state court).  Biggerstaff also sued the FCC directly, challenging a final rule relating to the existing business relationship ("EBR") exception to the TCPA as recently as 2007, the same year the faxes at issue in this case were sent.  *See Biggerstaff v. FCC*, 511 F.3d 178 (D.C. Cir. 2007) (dismissing Biggerstaff's petition as untimely, since it related not to the 2006 final rule, but, instead, to the 1992 decision adopting the EBR exception).  It is notable that in that case, Biggerstaff established his standing to sue by citing junk faxes he has received, but "has refrained from suing on because of the likelihood he will face the [EBR] defense," and the fact that he had confronted the defense in other suits in which he has been the plaintiff.  *Id*. at 182-83.

In 2000, Biggerstaff co-authored with a member of the New York and Connecticut bars an article entitled, "Application of the Telephone Consumer Protection Act to Intrastate Telemarketing Calls and Faxes."  52 Fed. Comm. L.J. 667 (2000).  He described himself as follows:

> Robert R. Biggerstaff is the Interim President of the privacy-advocacy group, NAMED, Inc.  Mr. Biggerstaff is a nontraditional

> student of the law.  He lives on a small island off the coast of
> South Carolina, far from the nearest law school.  As a result, he
> studies law independent of the traditional academic environment
> and intends to read for the bar.  His nontraditional background
> notwithstanding, he is considered by many to be one of the
> foremost experts on construction and application of the TCPA, as
> well as a tenacious litigator.

*Id.* at n.1.  As the title suggests, this article argued that the TCPA applies to purely intrastate calls

and fax advertisements.

The following year,  Biggerstaff published a law review article entitled, "State Courts and

the Telephone Consumer Protection Act of 1991:  Must States Opt-In? Can States Opt-Out?" 33

Conn. L.Rev. 407 (2001).[6]  In this article, which had no co-author, but used some of the same

language as the earlier piece,  Biggerstaff identified himself as "Interim President of the privacy

rights group, the National Association Mandating Equitable Databases, Inc. (the NAMED, Inc.)

and member of the South Carolina Joint Legislative Privacy Study Committee."  *Id.* at n.1.  In

the article,  Biggerstaff bemoans the fact, "in an ironic twist of legislative shortsightedness,

although the TCPA proscribes a wide range of offensive conduct, private enforcement actions

are fully expected to be brought by pro se plaintiffs in small claims court and are essentially

limited to such imperfect prosecutions."  *Id.* at *410-11. [7]

---

[6] The article is focused on criticism of the Fourth Circuit's decision in *Int'l. Sci. & Tech. Inst., Inc. v. Inacom Commc'n, Inc.*, 106 F.3d 1146, 1157 (4th Cir. 1997), interpreting § 227(b)(3) of the TCPA to allow private actions under the statute only in state courts, and suggesting, in dicta, that states could legislatively choose not to permit such jurisdiction in their courts.

[7] Biggerstaff cites the statements of Senator Hollings, who, in what  Biggerstaff terms "the only expression of intent of the private right of action" in the legislative history, explained that:

> The substitute bill contains a private right-of-action provision that
> will make it easier for consumers to recover damages from
> receiving these computerized calls. The provision would allow
> consumers to bring an action in State court against any entity that
> violates the bill. The bill does not, because of constitutional
> constraints, dictate to the States which court in each State shall be

In addition to his plaintiff cases, law review articles and advocacy group activities – all directed at his stated goal of trying to make "illegal telemarketers . . . become extinct" [8]-- Biggerstaff also wrote and filed *amicus* briefs.  In 2001, Biggerstaff filed an *amicus* brief, *pro se*, in the Supreme Court of Ohio, in a case called *Charvat v. Dispatch Consumer Services, Inc*. Biggerstaff described his interest in the litigation as follows:

> Amicus Robert Biggerstaff, is widely recognized as one of the foremost authorities on the application of the Telephone Consumer Protection Act ("TCPA").  He publishes a slip reporter service on the TCPA, and is an author of seminal law review arties and other publications on the TCPA…. He is also a nationally recognized expert in the area of consumer privacy protections of the type the TCPA is intended to preserve….

Brief of *Amicus Curiae* Robert Biggerstaff in *Charvat v. Dispatch Consumer Serv., Inc*., No. 2000-1725, 2001 WL 34556252, at *1 (Ohio Mar. 26, 2001) (regarding the scope of the "established business relationship" exception).  Ironically, in this brief, Biggerstaff continued to sound the refrain that TCPA actions "are intended for the most part to be brought by *pro se* consumers in state small claims courts."  *Id.* at *23.  That was evidently before he developed a relationship with the Ohio lawyers who turned the B2B database into a TCPA cottage industry, and turned to paid testimony himself.  *See also* Brief of *Amicus Curiae* Robert Biggerstaff in *Mulhern v. Macleod*, No. SJC-09153, 2003 WL 23641858, at *2 (Mass. Nov. 12, 2003) (arguing

---

> the proper venue for such an action, as this is a matter for State legislators to determine. Nevertheless, it is my hope that States will make it as easy as possible for consumers to bring such actions, preferably in small claims court.…  Small claims court or a similar court would allow the consumer to appear before the court without an attorney. The amount of damages in this legislation is set to be fair to both the consumer and the telemarketer.

*Id*. at *416-17.

[8] See NAMED Press Release (attached as Ex. F).

that TCPA cases can be brought in state court without the state "opting-in" to hear them).

In sum, Biggerstaff has been for well over a decade a ferocious advocate against TCPA violations, serving in multiple roles as a plaintiff, pro se advocate, commentator, pundit, and nonprofit group leader.  All this occurred long before he ever took a TCPA case as an expert "computer forensics" witness. While bias has been considered by some courts to be grounds for cross-examination, rather than a basis for exclusion, where the bias is extreme, as it is here, it may so undermine the reliability of the expert as to require his exclusion.  *See In re Welding Fume Products Liab. Litig.*, 534 F.Supp.2d 761, 766   (N.D. Ohio 2008) (allowing expert testimony, but noting exclusion may be appropriate where the "showing of bias is so extreme that exclusion is appropriate under *Daubert*).[9]

## II.    BIGGERSTAFF'S  METHODOLOGY AND OPINIONS ARE UNRELIABLE

Biggerstaff's role in this (and the numerous other TCPA cases in which he is involved) is to isolate the targeted fax numbers from fax broadcaster records, retrieve identifying information from those records and produce for the plaintiffs a list of members of the class they purport to represent.  This much is made clear from Biggerstaff's initial declaration, provided before he had reviewed many documents.  *See* Ex. K to LQ's Opposition to Motion for Class Certification. This report provided a general overview of TCPA litigation and discussed the importance of securing fax broadcast records in both class and individual actions.  Biggerstaff opined that, once the fax broadcast records were produced and reviewed by him, he could identify the number of faxes attempted, the number successfully received and the identities of the fax recipients.  *Id.* ¶

---

[9] The extent and nature of Biggerstaff's bias also support exclusion under Fed.R.Evid. 403, in that any probative value it might have is far outweighed by the danger of confusing the issues, misleading the factfinder and wasting time.

15.  Biggerstaff no doubt expected this to be like many of the hundreds of TCPA cases in which he is involved where he simply mines the call data records or fax logs.

However, this is not Biggerstaff's typical TCPA case.  The fax broadcast records identifying the fax number to which the faxes were sent are not available from Protus.  *See* Confid. Ducharme Dep. (Ex. C-2 to LQ's Opp.).  The absence of the fax logs—the "Rosetta stone" of any TCPA case—prompted Brey to request in 2012 that Salesgenie, a company used by LQ employees involved in this case as a "leads generator" in 2007, attempt to create new lists based on the search criteria that LQ employees used in 2007 and 2008.  Only a few of the original search criteria had been saved (by employees Lawson, Williams and Comerford), so these were the only ones that were even potentially available to be re-run using Salesgenie's 2012 database.  Stipulation Pursuant to Rule 901 of the Federal Rules of Evidence, ¶ 31 ("Salesgenie Stip.") (attached as Ex. 13 to Pltf's Mot., Dkt. #55-13).[10]  Salesgenie applied the saved search criteria, and ran two searches, one to represent the results that would have obtained in 2007, and one for 2008.  A filter was applied in an attempt to eliminate persons or entities who were added to the database after the relevant time period (January 2007 or 2008).  *Id*. ¶ 33(b). However, the Salesgenie database is continually updated and changing, and because there are no "snapshots" available of how the database looked in 2007 or 2008, the 2012 lists "do nothing more than identify leads in the database that presently satisfy the search criteria used in 2007." Third Report of David Canfield, ¶ 13 (attached as Ex E to LQ's Opp.)

---

[10] Biggerstaff claims that it might be possible to recreate the list of fax recipients even where saved search criteria from Salesgenie are not available, if you have testimony about the scope of the searches or other sources of information.  Biggerstaff Dep. at 148.  Easy to say, but in this case no such testimony is available, as the LQ GM's had no independent recollection of the searches they ran.

Nonetheless, Biggerstaff blindly accepted the 2012 Lists and treated them *as if they were the fax logs*. His opinion is that the actual fax recipients of the LQ transmissions in 2007 and 2008 can be identified by using the 2012 Salesgenie lists. Biggerstaff Dep. at 125. Biggerstaff, by his own admission, did not test or in any way confirm the integrity of the 2012 Lists. *Id*. at 149. Biggerstaff also ignored contrary deposition testimony and admitted at deposition that he had not reviewed the parties' stipulation regarding Salesgenie that explained the nature of the database and its express limitations. Biggerstaff Dep. at 199. Instead, Biggerstaff conducted the same exercise he does in every case where he is provided with the *actual* fax logs, isolating the unique fax numbers from the 2012 search results and opining that these fax numbers can be used to trace personal information for purposes of identifying the class members and providing them notice. His stated goal in doing so is to "cap the liability of the sender" by "multiplying the number of victims by $500 under the TCPA." *Id.* at 145.

However, Biggerstaff, who claims that, as an engineer, he is detail-oriented,[11] either overlooked key facts or fundamentally misunderstood the nature of the database from which the 2012 Lists were derived. He recalled seeing 2012 Lists for only two LQ employees, April Comerford and George Lawson. *Id*. at 106. He did not recall seeing 2012 lists for a third employee, Johanns Williams. *Id.* at 103.[12] However, his own counsel claimed that the Williams lists had been provided to Biggerstaff. *Id*. Biggerstaff, a self-professed computer forensics expert, assumed that the searches were run on a "snapshot" of the leads generator database as it existed in 2007 and 2008. *Id*. at 127-28 ("I'm saying what they produced in 2012 was run

---

[11]   Biggerstaff Dep. at 26.

[12]   Biggerstaff keeps no file at all. Biggerstaff Dep. at 9. He appeared at his deposition empty-handed, although his counsel produced documents on a thumb drive that he said represented all that had been provided to Biggerstaff for review.

against a snapshot created, I believe they said, in January of each year.  So they have the same results that query would have produced in January of 2007 and then they have the same results that that query would have produced in January of 2008 and identified the differences between those two queries run against those two snapshots.").  In this case, he found a difference of about 3%, which he considered sufficiently close.  *Id.* at 131-32, 137-38.  However, this was based on a comparison between the 2007 and 2008 "versions" of the 2012 Lists – a worthless comparison because it conveniently overlooks the fact that neither list is, in fact, a "snapshot", and neither is a reliable indicator of who received an LQ fax in the first instance.  Entirely ignorant of the many flaws in his analysis, Biggerstaff vehemently defended the use of the "snapshot" method:  "I run queries against snapshot of databases all the time.  That's what you get, you get the exact same results as if you had done it in the past at the time of the snapshot."  *Id.* at 128.[13]

Whether that is true or not need not be argued here, because, in this case, as discussed above, Salesgenie did not run the saved search criteria and compare it to a "snapshot", since no "snapshot" data were available.  The searches were instead run on the database as it existed in 2012, and then Salesgenie excluded entries added after 2007 and 2008 respectively.  Salesgenie Stip. ¶ 33(b).  However, Salesgenie was constantly updating its database, so if, for example, a business listed in the database had fewer than 10 employees in 2007, but 25 employees in 2012, a search for businesses with 25 or more employees conducted on the 2012 database would include this business, whereas a 2007 search would not have included it.  Salesgenie itself agrees that it "cannot recreate the results returned in response to any particular search at a given date in the past," and the parties have so stipulated as well.  Affidavit of Kim Wallin (April 15, 2013), ¶ 31 (attached as Ex. J to LQ's Opp.) ("Salesgenie Aff."); Salesgenie Stip. at ¶ 33(f) ("Infogroup

---

[13] Biggerstaff admitted that he "did not do any statistical analysis using traditional statistic formulas."  *Id.* at 137.

cannot ensure that the Recreated Results are the same as the search results that were returned in response to the original searches by the Four LQ Users because of uncertainty as to when, during any given year, certain contacts and data were added, deleted or changed in Infogroup's database.").  Biggerstaff, by his own admission, did not understand how the 2012 Salesgenie lists were actually generated, did not comprehend the limitations of the 2012 Lists, and did nothing at all to verify the accuracy of the lists.  Biggerstaff Dep. at 139-40.

Biggerstaff also failed to test the integrity of the search results by comparing them against the limited known data that was saved by the LQ end users and was available for his review. Biggerstaff's opinion about the validity of the data was based on his assumption that the true number of faxes sent would fall somewhere between the January 2007 "snapshot" and the January 2008 "snapshot".  *Id.* at 185.  As long as "your before and your after are very, very close to each other in terms of percentages, you're going to have a good representation of what it looked like in between." *Id.* at 136.

When asked in his deposition to actually examine more closely the data for the recreated lists relating to Johanns Williams, it quickly became apparent that Biggerstaff's assumptions and the data did not correlate at all, and certainly not in the way he assumed they would.   Biggerstaff was shown a Salesgenie saved search[14] from 2007 for  Williams that showed 4,644 hits.  He affirmed that if his methodology is appropriate, the 2012 Lists should be "something at least close to that," or, at least "comparing the two numbers to 2007 and 2008 number, it should be between those two."  *Id.* at 191.  However, the 2007 list showed 3,474 hits and the 2008 list

---

[14] Only a limited number of saved searches showing the parameters of the original search are available, as Salesgenie did not retain this information unless the end user so specified. Salesgenie Stip. at ¶ 21.

showed 3,603 hits.  *Id.* at 197-98.  He admitted that the 4,644 number does not, obviously, fall

between 3,474 and 3,603.  *Id.* at 198 (conceding "it doesn't correlate").

Pushing on,  Biggerstaff was directed to another of the saved searches done by  Williams,

relating to high schools.  The Salesgenie saved search data indicated that there were 429 hits for

the "senior high school" search when  Williams ran it.   Biggerstaff indicated that if his

methodology and assumptions underlying it are accurate, 429 would fall somewhere between the

Salesgenie-created list ("snapshot") for 2007 and the one for 2008.  *Id.* at 185.  However, the

"recreated" list for 2007 has a count of 735 hits.  *Id.* at 187.  Instead of being less than 429, it is

far greater, suggesting that the 2012 lists sweep in hundreds more senior high schools than could

have even potentially received a fax from  Williams in 2007 (and that assumes he sent faxes to

every hit, instead of selecting from the list before sending).   Biggerstaff was forced to

acknowledge that the 2012 Lists are not an accurate representation of the original fax lists:

> Q.     How does that impact your opinion on the accuracy of the recreated lists?
>
> A.     It would appear the recreation or the underlying data is not a precise
>        representation.

*Id.* at 187-88.

Not only is it not a precise representation, but in almost every instance when the 2012

Lists are compared to the actual number of hits found in the saved searches, the differential is

large and almost always in the opposite direction – *i.e.*, the 2012 Lists have fewer entries than the

saved searches suggest they should.  LQ's expert David Canfield did the comparison analysis

that Biggerstaff failed to consider and found the following results:[15]

---

[15] *See* Third Report of David E. Canfield (June 10, 2013) at ¶ 23, Table 1 (attached as Ex.
E to LQ's Opp.).

| Actual Count | | | | Recreated Results Count | |
|---|---|---|---|---|---|
| IRN | Records | Saved Criteria Description | | 2007 | 2008 |
| | | **Johanns Williams' Criteria** | | | |
| 1258861910 | 429 | high school | Report 1 | 735 | 735 |
| 1258889676 | 1,352 | Bars, Cocktail Lounges, Dance Clubs, Night Clubs, Pubs | Report 2 | 438 | 454 |
| 1258889811 | 4,640 | 15.0 Mile(s) from centroid of 60443 in Matteson, Il. | Report 3 | 3,474 | 3,603 |
| 1258954068 | 5,040 | 10.0 Mile(s) from centroid of 06902 in Stamford, Ct. | Report 4 | 3,868 | 3,945 |
| 1259075090 | 30,599 | 45 cities in Illinois | Report 5 | 4,477 | 4,578 |
| | | **Complete Order Criteria** | | | |
| 1265080404 | 970 | 15.0 Mile(s) from centroid of 30907 in Augusta, Ga. | Report 1 | 2,951 | 2,985 |

Even accepting, for the sake of argument, Biggerstaff's view that due process comports with over-notice, it is highly unlikely that giving notice using the 2012 Lists would reach any actual 2007 LQ fax recipient.

Another flaw in Biggerstaff's methodology is that he fails to account for the fact that LQ employees testified they ran searches for "leads" using the Salesgenie tool, and then selected from those lists the entries to whom faxes would be sent.  *See* Deposition of Johanns Williams (Dec. 12, 2012), at 19-20, 41-42 (attached as Ex. B to LQ's Opp.); Deposition of George Lawson (Feb. 20, 2013) at 20, 51, 100 (attached as Ex. 4 to Pltf's Mot., Dkt. # 55-4).  Biggerstaff admitted that "it's possible that a record was pulled but may not have been selected for faxing." Biggerstaff Dep. at 134.  However, he opined that this is not a problem because "that's the essence of fluid recovery."  *Id.*  He elaborated that, in his opinion, it doesn't matter if your list is over-inclusive, because even if "you have over notice . . . you're satisfying due process."  *Id.* at 148.  Comparing it to a situation where an individual on an airplane is found to have

17

tuberculosis, Biggerstaff said that you want to give notice to everybody on the plane, even those "way up in first class." *Id.* at145.  He continued:

> You're going to be given the entire population for purposes of notice so that nobody who got one fails to receive notice.  And that satisfies due process so that the defendant gets res judicata over everybody who possibly received one of these.   You can supplement that with publication notice.  And that satisfies due process.. And that is the essence of fluid recovery and what's called by some people, cap and gift.   But the liability of the defendant is not affected by the over notice because the [sic] liability is capped at the number of the faxes their own agent says were actually sent.

*Id.* at 149.

Again, it is obvious that Biggerstaff's mistaken, and untested, assumption about the over-inclusiveness of the 2012 Salesgenie lists renders his opinions unreliable.  Indeed, in Biggerstaff's view, you don't need to know who received a fax, "[b]ecause the liability attaches by it being sent so you need to do your notice to the entire population to which the fax might have been sent." *Id.* at 166.[16]  In addition to  Biggerstaff not being qualified as a legal expert on the TCPA (whatever he might think of his own skills in this regard), his cavalier attitude toward the accuracy of his opinions is amply evident.  When a fact inconveniently suggests his analysis his flawed, he simply asserts that it makes no difference and goes blithely on.[17]

---

[16] This is yet another legal opinion:  that liability attaches upon the sending of a fax, whether it is actually received or not.  While not the topic of the instant brief, suffice it to say that LQ disagrees with this interpretation.

[17] In this case, Biggerstaff's opinion is that the loss of the Protus fax logs does not matter because the 2012 lists are close enough to satisfy "due process."  However, in a 2005 affidavit in a case in Missouri state court, Biggerstaff opined, to the contrary, that the loss of the fax broadcaster's logs of fax transmissions results in "immediate and irreparable harm to those persons whose records were lost and who could not participate and recover damages." Biggerstaff Affidavit in *Micro Eng'g, Inc. v. Protus IP Solutions*, No. 05CC-000401 (Mo. Cir. Ct. Jan. 14, 2005), at ¶ 8 (attached as Ex. G).  Apparently, Biggerstaff is untroubled by the notion that, in this case, use of the 2012 Lists to certify a class would result not only in the non-participation of some class members whose initial records were lost, but the inclusion of many class members who never got an offending fax at all.

Biggerstaff failed to look for or to notice another large red flag that contradicted his unexamined assumption about the over-inclusiveness of the list of fax numbers he has created from the 2012 Salesgenie lists. Specifically, Biggerstaff failed to look for Brey's phone number on his list. *Id.* at 149. If he had, he would have noticed that Brey was not on any of the lists, despite its allegation that the company received two faxes from LQ, one on March 15, 2007 and another on August 15, 2007. Class Action Compl. ¶ 14 and Exs. A and B (Dkt. #1).[18] After being confronted with this fact in his deposition, Biggerstaff responded with a nonsense phrase that he used repeatedly: "[T]he absence of evidence is not evidence of absence." Biggerstaff Dep. at 150; *see also id.* at 211.[19]

Ultimately, Biggerstaff retreated back to his ultimate position, which is that it does not matter whether his analysis is correct or not, or even whether any lists at all of fax recipients exists, because you can always just give publication notice. "I mean look at the HerbaLife class actions and others under the TCPA, there have been no records whatsoever, no criteria whatsoever, they just do publication notice." *Id.* at 211. He reiterated, "The important thing is that there is a cap on the liability of the advertiser because they know exactly how many faxes they've sent and that caps their liability, it's not unknown or unlimited." *Id.* at 211.[20] This may

_____

[18] One of Williams' saved searches used the criteria of "business leads" within 8.0 miles of Jessup, MD., zip code 20794 (Pltf's Mot. at 22), and Brey alleges that one of the faxes he received was sent to his store in Laurel, MD, less than 7.0 miles from Jessup. Plaintiff's Objections and Responses to Defendant's First Set Of Interrogatories, Response No. 5 (April 25, 2012) (attached as Ex. M to LQ's Opp.); http://www.distancescalculator.com/US/distance-between-Laurel-MD-and-Jessup-MD. If the 2012 Lists were reliable, they should have included Brey's fax number when the Williams saved search criteria was run against it.

[19] At another point, when asked if the problems identified in connection with the Williams lists might plague his other analysis, Biggerstaff responded, "There are too many unknowns to answer that with any degree of specificity. There is a potential universe where the answer is yes. There's a potential universe where it's not, where it's no." *Id.* at 198-99.

[20] In this case, Biggerstaff identified 38,553 "successful [fax] transmissions" sent between February 26, 2007 and August 9, 2008, based on the 2012 lists. *Id.* at 114-115. However, even if this number were correct, which it is not, this includes faxes that are time-

be the "important thing" to Brey's counsel, who are seeking to fix a large number as the statutory liability in order to attempt to extract a large settlement or maximize any judgment, but it is meaningless if the number is insupportable because it comes from unreliable lists whose content bears little, if any, relationship to the number or identity of actual recipients of the faxes in question.

In his Third Declaration, issued after his deposition was taken, Biggerstaff essentially admits as much.  *See* Third Declaration of Robert R. Biggerstaff (June 28, 2013), at ¶ 12 ("Some of  Canfield's remarks regarding potential usefulness of the Salesgenie (SG) recreations for some applications are well taken – if the representations of the Infogroup affiants are true.") (attached as Ex. L to LQ's Opp.).  Of course,  Biggerstaff has no basis to believe the Infogroup sworn statements are untrue, and, in any event, Brey has stipulated to their veracity. [21]

It is evident that Biggerstaff will say anything to support Brey's position, no matter how farfetched the opinions or how lacking in evidentiary support.  Indicative of how far onto a limb he will climb is his "opinion" that, even though saved search criteria were not available for all LQ employees, "if you look at the number of faxes that were sent, you could look at, you know, the fax numbers around the hotel."  Biggerstaff Dep. at 145-46 (it just "depends on how close your approximation needs to be").  Biggerstaff further offered that he could "take a stab" at divining GM Courtemanche's 2007 searches, though there are no saved search criteria and Courtemanche had no recollection of the search terms.  *Id*. at 146.  Of course, he has not done

---

barred in this case.  Brey claims that the class consists of recipients of 26,497 faxes.  Pltf's Mot. at 2.

[21]  Biggerstaff's Third Declaration, though ostensibly issued in response to David Canfield's report, was used by Biggerstaff primarily to toss some spaghetti onto the wall as to the limitations of the facts contained in the Salesgenie affidavit, which he had not been provided until after he had written two reports and given a deposition in this case.  However, Brey has stipulated to the same facts, rendering Biggerstaff's effort futile, even if it were not otherwise feeble.  *See* Salesgenie Stip.

any of this, and it is pure fantasy to think that he could.  Accordingly, while Biggerstaff continues to insist that there are other ways to get the information needed or to manipulate the available data, he has not followed those avenues, and, accordingly, his speculation as to what "could" be done or examined should be disregarded.

Biggerstaff's flawed methodology is quite evidently not the type that computer forensics specialists or others in his field would follow.  As the Supreme Court has cautioned, the Court's goal as a "gatekeeper" should be "to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  Here, Biggerstaff's opinions are utterly devoid of intellectual rigor, or even common sense.  Expert testimony should be excluded when "[a] court … conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).  In this case, there is a veritable chasm between the data and the opinion.  Brey's utter failure to meet its burden requires the exclusion of Biggerstaff's opinions in their entirety.

## III.   MUCH OF BIGGERSTAFF'S TESTIMONY CONSISTS OF AND IS UNDERLAID BY IMPROPER LEGAL OPINIONS, WHICH MUST BE EXCLUDED

The Fourth Circuit has made clear that "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."  *U.S. v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006).  As the discussion above makes clear, Biggerstaff's opinions cross well over the line into this territory and should be excluded for this reason as well.

As a threshold matter, Biggerstaff is obviously unqualified to offer legal opinions.[22]  No matter how thorough his personal studies into the TCPA or its legislative history may have been, he has no formal legal training, has never attended law school and is not the member of any bar. In addition, Biggerstaff was not offered by Brey as a legal expert.  *See* Plaintiff's Rule 26(A)(2) Expert Witness Disclosure (Oct. 16, 2012) (attached as Ex. H).  While Biggerstaff repeatedly states that he just analyzes the data he is given and does the math, in reality he attempts to convince the Court as to the merits of Brey's position in the litigation.  His stated goal as an advocate is to use the TCPA to punish senders of unsolicited fax advertising, and serving as an expert in these cases gives him a pulpit from which to render opinions such as his opinion that due process is served as long as the list of fax recipients is over-inclusive, or that no list of class members at all is necessary to certify a class because you can always just do publication notice.[23] These opinions trample into the territory reserved for the Court, which should not be tolerated.

## CONCLUSION

Biggerstaff's history as a plaintiff himself, a privacy advocate, a lobbyist, and a *pro se amicus curiae* make evident that he has an axe to grind.  Unable to draw boundaries between these other personas and his designated "computer forensics expert" role in this case, he offers legal conclusions which he is unqualified to give and which invade the province of the Court.

---

[22] LQ does not challenge Biggerstaff's qualifications as a computer forensics expert for purposes of this motion.

[23] One issue Biggerstaff does not take on is how publication notice could be effective. Who would recall if they had been sent a single fax advertisement from LQ in 2007?  Indeed, it is highly doubtful that individual notice would be significantly more effective, as the fundamental problem of whether any recipient of notice would be able to determine if he or she was, in fact, a class member is likely impossible to solve.  This fundamental problem with the litigation would render continued prosecution of the case as a class action purely punitive in nature – the ultimate manifestation of Biggerstaff's personal opinion that the most important function he serves is not to help identify the class, but to identify a given number of faxes that were sent so as to "cap" the defendant's liability.

Even as a computer forensics expert, his bias interferes with his methodology, which is flawed in almost every respect.  As a result, his "list" of fax numbers bears almost no relationship to the actual recipients of these faxes, whose identity it is impossible ever to know.  The class proposed by Brey is not ascertainable, and LQ's due process rights – something Biggerstaff does not concern himself with – would be violated if a class were certified based on the 2012 Salesgenie lists.  Under all these circumstances, the Court should exclude the testimony and opinions of Biggerstaff for purposes of considering Plaintiffs' Motion for Class Certification because they are manifestly unreliable and unscientific.

Respectfully submitted,

**DYKEMA GOSSETT PLLC**


By:___*/s/ Terri S. Reiskin*_____
        Terri S. Reiskin, Bar No. 05256
        1300 I Street, N.W.
        Suite 300 West
        Washington, DC  20005
        Telephone: 202-906-8609
        Facsimile: 202-906-8669
        Email: treiskin@dykema.com

        Rosa M. Tumialán, *pro hac vice*
        10 S. Wacker Drive, Suite 2300
        Chicago, IL 60606
        Telephone: 312-876-1700
        Facsimile: 312-627-2302
        Email: rtumialan@dykema.com

Kelly F. Bagnall, *pro hac vice*
1717 Main Street, Suite 4000
Dallas, TX  75201
Telephone: 214-462-6426
Facsimile: 855-230-2515
Email: kbagnall@dykema.com

**ATTORNEYS FOR DEFENDANT
LQ MANAGEMENT L.L.C.**